## In re Condemnation of Lands Situate and Being in the City of Scranton

C.P. of Lackawanna County, no. 98-CV-4719.

*W. Boyd Hughes* and *Barbara J. O'Hara,* for Redevelopment Auth. of the City of Scranton.

*Frank J. Bolock* and *Vincent Cimini,* for City of Scranton.

*Andrew Hailstone* and *A. James Hailstone,* for Adams Parking Inc.

NEALON, *J.,* December 23, 1998—

## I. STATEMENT OF FACTS

On February 24, 1953, the Redevelopment Authority of the City of Scranton, SRA, was created by resolution no. 3 of 1953 of the city council of Scranton for the purpose of "undertaking and carrying out various redevelopment projects in the City of Scranton." (Petitioner's exhibit no. 4, p. 3.) In furtherance of its mission, the SRA executed various loan and grant agreements with the U.S. Department of Housing and Urban Development until the passage of the Housing and Community Development Act of 1974, at which time such HUD funding and related activities were consolidated into the Community Development Block Grant Program. (*Id.*) Consequently, on April 17, 1981, the SRA entered into a closeout agreement with the City of Scranton and HUD to complete four urban renewal projects and to remit any surplus funds to HUD to be applied as a credit for the benefit of the city. (See city council resolution no. 14 of 1986, p. 2.)

Since the SRA failed "to abide by the provisions of the closeout agreement and to remit said funds to HUD for the benefit and credit of the City of Scranton," (*id.*), the city enacted a resolution on April 24, 1986 which directed, inter alia, that all administrative and operational functions of the SRA were to be incorporated into the Office of Economic and Community Development of the City of Scranton. (*Id.*, p. 3.) The resolution further provided that the SRA would remain in existence solely for the purpose of enabling the city to lawfully condemn properties in eminent domain proceedings. (*Id.*, p. 2.) The city's resolution was subsequently adopted by the SRA Board of Directors on June 4, 1996. (See petitioner's

exhibit no. 4, pp. 1-2.) According to the current executive director of OECD, Parnell Joyce, Esquire, and his administrative assistant, Jody Baden, OECD has acted as the administrative and operational arm of the SRA since that date, and all SRA resolutions, minutes, agendas and correspondence are prepared and processed by OECD personnel. (See Notes of Transcript of Proceedings ("N.T."), pp. 29-33, 46.)

On February 17, 1989, OECD entered into a "legal services general counsel" agreement with the law firm of Henkelman, Kreder, O'Connell & Brooks (now Kreder, Brooks, Hailstone & Ludwig) to provide legal services in connection with certain OECD projects. (Petitioner's exhibit no. 1, p. 1.) The contract identified 10 separate OECD projects, including "86-137" and "86-300," which were to be the subject matter of the Henkelman agreement. (*Id.*) OECD's finance manager, Margaret Quinn, and Ms. Baden both testified that "86-137" refers to the "Hotel Casey project" whereas "86-300" pertains to SRA matters. (N.T., pp. 21-22, 41.) The legal services contract was executed by Andrew Hailstone, Esquire, as the authorized signatory for the Henkelman firm (collectively referred to as Hailstone). (Petitioner's exhibit no. 1, pp. 2-3.)

From February 17, 1989 through September 29, 1989, Hailstone billed OECD $48,585.84 for legal services rendered in connection with OECD projects. (See petitioner's exhibit no. 2.) Hailstone's billings that were submitted to OECD reflected the date of the service, a brief description of the work performed and an itemization of the time devoted to that task. (*Id.*) Upon receipt of the quarterly billing statements, OECD staff would assign one of the 10 OECD project numbers to each in-

dividualized billing based upon the description of the work performed. (N.T., pp. 14-15.)

According to the statements that were submitted to OECD from February 17, 1989 to September 29, 1989, Hailstone provided services with respect to the Hotel Casey project (86-137) on April 19, 1989, April 24, 1989, April 25, 1989, May 1, 1989, May 2, 1989, May 31, 1989, June 12, 1989, June 13, 1989, June 15, 1989, June 26, 1989, June 27, 1989, June 28, 1989, July 6, 1989, July 7, 1989, July 10, 1989, July 17, 1989, July 19, 1989, July 22, 1989, July 25, 1989, July 26, 1989, July 27, 1989, July 31, 1989, August 4, 1989, August 7, 1989, August 8, 1989, August 9, 1989, August 10, 1989, August 12, 1989, September 5, 1989, September 6, 1989, September 7, 1989, September 8, 1989, September 11, 1989, September 12, 1989, September 13, 1989, September 14, 1989, September 15, 1989, September 17, 1989, September 18, 1989, September 19, 1989, September 20, 1989, September 21, 1989 and September 25, 1989, based upon the assignment notations made by OECD. (Petitioner's exhibit no. 2.) In addition, the OECD designations reflect that Hailstone charged for work performed on SRA matters (86-300) on March 28, 1989, April 19, 1989, April 20, 1989, June 14, 1989, June 15, 1989, August 4, 1989, August 9, 1989, August 10, 1989 and August 31, 1989. (*Id.*)

Hailstone's billings indicate that he began discussing a possible "contract purchase agreement for [the] Casey Parkway" with OECD staff and the SRA solicitor on April 24, 1989. (Petitioner's exhibit no. 2, p. 12.) At that time, the Casey Parkway was owned by Scranton Life Realty Co., and Mr. Anthony J. Rinaldi was the sole owner and stockholder of Scranton Life Realty Co. (N.T.,

p. 227.) During the course of the negotiations regarding the purchase of the Casey Parkway, Hailstone represented OECD, while Rinaldi's brother, Raymond C. Rinaldi, Esquire, acted as counsel for Rinaldi. (See *e.g.,* petitioner's exhibits nos. 6, 8-11, 13.)

On May 1, 1989, Hailstone participated in conferences with Attorney Rinaldi and OECD Executive Director Timothy McDowell concerning the Casey Parkway. (Petitioner's exhibit no. 2, p. 14.) On the following day, Hailstone conducted a "telephone conference with Attorney Rinaldi re Casey" and a subsequent "telephone conference with Mr. McDowell re details of Casey Parkway purchase." (*Id.*) As a result of those discussions, Hailstone forwarded a letter to Attorney Rinaldi on May 2, 1989 regarding the "proposed purchase by the City of Scranton of premises located on Adams and Lackawanna Avenues in the City of Scranton from A.J. Rinaldi" and stated:

"This will confirm several conversations. The deal has been adjusted from what was set forth in the first draft of the purchase agreement. It is my understanding that the following items are now a part of the transaction:

"(1) The parking garage will be released back to A.J. at a monthly rental of $3,850;

"(2) A.J., as the operator of the garage, will commit to make substantial capital improvements to the garage as are necessary to assure continuous operations as a public parking garage with at least 400 parking places;

"(3) An easement will be established and granted to A.J. for vehicular ingress, egress, and regress from the entrance located at the southeast corner of the parking garage to the court that runs parallel to the 100 block of Adams Avenue;

"(4) The total purchase price of $1,350,000 will be allocated as follows:

"(i) Garage                                $750,000;
"(ii) Eagen's building                     $475,000; and
"(iii) Lackawanna Avenue building  $125,000

"All other aspects of the deal as set forth in the first draft of the proposed purchase agreement shall remain the same.

"Please let me know that these are terms which are acceptable to your brother and I will revise the agreement to include them." (Petitioner's exhibit no. 8, pp. 1-2.)

On May 12, 1989, Hailstone forwarded a letter directly to Rinaldi memorializing a discussion Rinaldi "had with Timothy McDowell, executive director of Scranton's Office of Economic and Community Development *and the chief active staff officer for the Scranton Redevelopment Authority.*" (See petitioner's exhibit no. 9.) (emphasis added) Hailstone's correspondence advised Rinaldi that the SRA and the City of Scranton needed certain properties "owned by you" for the Hotel Casey project, and that the SRA was "ready to condemn those properties and ha[d] already authorized condemnation action for any properties related to the Casey Hotel redevelopment."[1] (*Id.*) Hailstone further cautioned Rinaldi that:

"As we told you, unless an agreement for the city's purchase of these properties can be amicably arrived at within the next six weeks, the Redevelopment Authority will condemn those properties, offer you its appraisal as

---

1. The caption of the correspondence dated May 12, 1989 referenced properties owned by Rinaldi at 523 Lackawanna Avenue, 112-122 Adams Avenue, 126 Adams Avenue and 128-140 Adams Avenue.

just compensation and require you to seek any further compensation through the eminent domain process.

"I hope that an agreement can be reached so that a deed can be obtained from Scranton Life Realty Company *in lieu of condemnation.*

"Please *let me* and Mr. McDowell know your position in this regard at your earliest convenience." (*Id.*) (emphasis added)

Throughout June 1989, Hailstone billed OECD for drafting and revising various versions of the "Hotel Casey agreement" and the "Casey development agreement." (See petitioner's exhibit no. 2, pp. 20-22.) Furthermore, on June 13, 1989, Hailstone participated in a "conference with A.J. Rinaldi re sale of Casey Parkway and Clark building," and on June 15, 1989, he not only met with Mr. McDowell and SRA counsel concerning "SRA acquisitions," but also attended an SRA meeting. (*Id.*, p. 21.) On June 27, 1989, he reviewed and revised the "Casey Parkway purchase agreement" and thereafter forwarded a letter to Attorney Rinaldi on June 28, 1989, enclosing "a revised form of agreement for the purchase of the Casey Parkway, the Clark & Snover building, and 523 Lackawanna Avenue." (Petitioner's exhibit no. 10.)

As reflected by Hailstone's letter dated May 2, 1989 to Attorney Rinaldi (see petitioner's exhibit no. 8), the city and Rinaldi had reached an understanding that upon Rinaldi's sale of the Casey Parkway to the City of Scranton via his wholly owned company, Scranton Life Realty Co., the city would agree to lease the parking garage "back to A.J. at a monthly rental of $3,850." (*Id.,* p. 1.) Thus, on July 3, 1989, Rinaldi executed articles of incorporation to form "Adams Parking Inc." to operate as the eventual lessee/tenant of the Casey Parkway lease.

(See petitioner's exhibit no. 17.) The articles of incorporation for Adams Parking Inc. were filed with the corporation bureau of the Department of State for the Commonwealth of Pennsylvania on July 10, 1989, and reflect that Rinaldi was the sole owner of that entity. (*Id.,* p. 2.) Rinaldi testified that he continues to be the sole shareholder and owner of Adams Parking Inc. and Scranton Life Realty Co. (N.T., p. 228.)

In addition to billing for revisions to the "Casey agreement" on July 3, 1989 and July 7, 1989, (petitioner's exhibit no. 2), Hailstone also drafted a "proposal for Casey Parking title insurance" on July 10, 1989. (*Id.,* p. 23.) More importantly, on July 17, 1989, he conducted legal research of "35 P.S. §1712.1" and participated in a telephone conference with Mr. McDowell "re SRA procedure to condemn Hotel Casey." (*Id.*) 35 P.S. §1712.1 is contained in the Urban Redevelopment Law, 35 P.S. §1701 et seq., and is specifically entitled *"Blighted property removal."* (emphasis in original) Section 1712.1(a) of the URL states that any redevelopment authority has the power to acquire any blighted property by eminent domain, provided, however, that "[s]uch power on the part of any redevelopment authority shall be conditioned upon the creation or existence of a vacant property review committee by ordinance of the governing body of the municipality." 35 P.S. §1712.1(b). In addition to defining "blighted property," section 1712.1 delineates the procedures to be followed in condemning blighted land, including the requirement that the vacant property review committee must determine that a particular property is blighted and thereafter certify that finding to the Redevelopment Authority. 35 P.S. §1712.1(c), (e). See also, *Redevelopment Authority of Scranton v. Kameroski,*

151 Pa. Commw. 345, 616 A.2d 1102 (1992) (discussing SRA's condemnation of Lackawanna Avenue property which had been certified as blighted).

In an effort to facilitate the condemnation of blighted property for the Hotel Casey Project, Hailstone reviewed and revised the Vacant Property Review Commission ordinance on July 25, 1989, and thereafter participated in telephone conferences with McDowell and Assistant City Solicitor Carlene Gallo, Esquire, regarding the VPRC ordinance. (Petitioner's exhibit 2, p. 24.) Following a subsequent telephone conversation with Attorney Rinaldi on July 26, 1989, Hailstone revised the "Rinaldi purchase agreement" and the "Casey development agreement" and drafted a "lease for Casey Parkway." (*Id.,* p. 25.)

On that same date, the city council of Scranton passed an emergency ordinance, no. 107 of 1989, authorizing the transfer of $285,000 "from OECD UDAG repayments account to purchase the Casey Parkway facility" from Rinaldi. (Petitioner's exhibit no. 14.) That emergency ordinance was later approved by the mayor on July 28, 1989, and included the following proviso which articulated the purpose of the transfer:

"Whereas, the City of Scranton is in the process of the rehabilitation of the Hotel Casey building; and

"Whereas, the City and Casey Hotel Corporation (developer) is in need of the necessary parking spaces for this development; and . . .

"Whereas, the purchase of this downtown parking garage along with adjacent lands is an economic development activity which will provide adequate parking within this quadrant of the central business district; and

"Whereas, such acquisition will ensure the success of the Hotel Casey rehabilitation project." (*Id.*)

The proposed developer of the Hotel Casey project at that time was the "Casey Hotel Corporation" which was operated by Mr. Gerard N. VonDohlen. (See respondent's exhibit no. 2.)

On July 28, 1989, Hailstone forwarded a letter to Attorney Rinaldi enclosing a final draft of the "agreement between Scranton Life Realty Co. and the City of Scranton with regard to the sale of the Casey Parkway, the Clark & Snover building and 523 Lackawanna Avenue to the city." (Petitioner's exhibit no. 11.) In his correspondence, Hailstone advised Attorney Rinaldi of the changes which had been made to the agreement and further enclosed a copy of the city council ordinance (file of council no. 105) approving "the agreement with Scranton Life Realty, which includes the lease and, therefore, implicitly, includes the lease." (*Id.*) Hailstone also informed Attorney Rinaldi that "[w]e still plan to close on Tuesday, August 1, 1989." (*Id.*)

On July 31, 1989, Hailstone spoke with Attorney Rinaldi by telephone regarding the closing, and thereafter spent three and one-half hours drafting the Casey Parkway lease. (See petitioner's exhibit no. 2., p. 25.) Hailstone testified that Mr. McDowell negotiated the lease terms governing the duration of the lease and the rental charges whereas he prepared the provisions relative to real estate taxes, utility fees, maintenance and repairs, equipment, alterations, removal of the tenant, the landlord's right of entry, insurance, force majeure, the tenant's compliance with laws, condemnation, signs, defaults, remedies, confession of judgment for rent, judgment for possession, waiver, holdover, notices, quiet enjoyment counterparts, insurance limitations, landlord's liability, brokerage fees, and standard lease language.

(N.T., pp. 90-91, 180.) (See also, petitioner's exhibit no. 7.) Specifically, article 13 of the lease sets forth the rights of the landlord (the City of Scranton) and the tenant (Adams Parking Inc.) in the event of the condemnation of the property by any governmental or public authority and states, in relevant part:

"(b) The tenant shall not be entitled to claim or receive any part of any condemnation award payable to the landlord by reason of any such taking, but shall nevertheless be entitled to claim and receive any and all separate damages and reimbursements allowed to a tenant under existing laws." (Petitioner's exhibit no. 7, p. 5.)

The lease further provides that it shall terminate on the date that the condemnor acquires title. (*Id.*)

On August 2, 1989, Hailstone attended a VPRC meeting, and on August 3, 1989, he appeared at a meeting of the city planning commission "re Blight of Casey." (See petitioner's exhibit no. 2, p. 27.) The VPRC had been established to declare the Hotel Casey blighted in compliance with 35 P.S. §1712.1, and *The Scranton Times* issued the following report on August 2, 1989 concerning the VPRC's meeting on August 2, 1989:

"Attorney Drew Hailstone, the city's special counsel on the project, said condemnation is 'one sure way to clear up title, just like on the (proposed $85-million Lackawanna Avenue) mall.'

" 'My recommendation was to use condemnation,' he added. 'It's a very useful and expedient process to get us to this point.'

"Asked why the city had waited until a month before the UDAG deadline to clear the Hotel Casey's title, Hailstone said the city had 'numerous problems' in locating parking space for the project before recently acquiring the former Jim Eagen's restaurant property for a garage.

"He noted that without parking facilities for the proposed 195-room hotel, the rehabilitation project would not have been viable. . . .

*"Hailstone also said preliminary objections to a condemnation action would prove frivolous because the building clearly is blighted."* (Petitioner's exhibit no. 13, p. 1.) (emphasis added)

Similarly, *The Scrantonian Tribune* published an article on August 3, 1989 with regard to the VPRC meeting and stated:

"Hailstone told the committee, which also consists of SRA Chairman Jeff Sunday and [former Scranton Mayor David] Wenzel, that their role is to act 'like a grand jury' in making a determination of blight.

"With that, Hailstone proceeded to malign the existing condition of the once prestigious hotel, referring to it as 'dilapidated, unsafe, unsanitary and absolutely unfit for human habitation.' For good measure, Hailstone also labeled it 'a public nuisance' and 'a fire hazard.' " (*Id.*, p. 2.)

Additionally, on August 3, 1989, *The Scranton Times* reported that the VPRC had "approved Hailstone's request to declare the hotel blighted" and noted:

"In asking for a blight declaration, Hailstone pointed out there are several criteria used to make such a determination, any one of which could result in a property being declared blighted.

"The criteria include a finding that the building is a public nuisance, a health and safety hazard, an 'attractive' nuisance to children or a fire hazard, he said. Other criteria include findings that it is dilapidated, unsafe, unsanitary, vermin-infested or lacking in facilities, he noted. . . .

"The structure is dilapidated, unsafe and unsanitary, a fire hazard and unfit for habitation, he said." (*Id.*, p. 3.)

On the following day, an article appearing in *The Scrantonian Tribune* stated that "Atty. Drew Hailstone noted that the hotel, 'a ticking time bomb ready to go off,' meets at least five of seven criteria any one of which would allow it to be condemned as blighted." (*Id.*, p. 4.)

On August 4, 1989, Hailstone attended an SRA meeting which had been scheduled in order to enable the SRA to act upon the blight recommendation made by the VPRC. (See petitioner's exhibit no. 2, p. 27; petitioner's exhibit no. 5.) The SRA minutes of its meeting on August 4, 1989 were transcribed by OECD Administrative Assistant Jody Baden and identified Hailstone as "counsel for SRA." (Petitioner's exhibit no. 5, p. 1.) The transcription of the SRA minutes quote Hailstone as follows:

"The Redevelopment Authority then takes that recommendation and the second recommendation of the city planning commission. *We* independently review the property and determine whether the property is blighted and if both certifications are for . . . . [t]he Redevelopment Authority then has the basis to declare the property blighted and authorize condemnation and redevelopment for the property . . . . [b]ased upon all of that, I submit to you that this property is a blighted property. However, these findings by the committee and the commission are both recommendatory. They recommend to you that in their opinion it is blighted. You have to make your own evaluation. You must discuss and consider a resolution declaring the property blighted and directing the counsel of Hughes, Nichols & O'Hara to proceed with condemnation." (Petitioner's exhibit no. 5, p. 2.) (emphasis added)

Based upon the advice of Hailstone, the SRA board unanimously passed a resolution authorizing its solicitor to proceed forward with the condemnation of the Hotel Casey property. (*Id.*, pp. 3-5.)

From August 4, 1989 through September 8, 1989, Hailstone billed OECD for various conferences and work concerning the "Rinaldi agreement and title," "Parkway lease," "closing on Rinaldi purchase," and revisions to the "lease and agreement for Rinaldi." (Petitioner's exhibit no. 2, pp. 28-31.) An entry dated August 8, 1989 documents 90 minutes of legal services devoted to "review Atty. Rinaldi's changes to lease; review and revise lease," (*id.*, p. 28), but does not reflect that Hailstone consulted or conferred with any OECD representative prior to revising the lease to incorporate Attorney Rinaidi's proposed changes. Similarly, Hailstone's billing entry for the Rinaldi closing on September 11, 1989 states "*negotiations* of final lease and agreement *with Rinaldi;* completion of closing with Rinaldi." (*Id.*, p. 31.) (emphasis added)

At the time of the closing on September 11, 1989, Rinaldi executed a deed that had been prepared by Hailstone to transfer the properties in question to the City of Scranton. (See petitioner's exhibit no. 6.) The deed incorporated an exhibit "A" which contained a concluding clause that states "[t]he within deed is being delivered by the grantor named herein to the grantee named herein, *in lieu of condemnation in connection with redevelopment and renovation of Hotel Casey as a project within the meaning of the Eminent Domain Code and the Redevelopment Act,* as [sic] is therefore exempt from realty transfer tax." (*Id.*, p. 5.) (See also, deed book volume 1299, pp. 363-68.)

Contemporaneously with the execution of the foregoing deed, the mayor of the City of Scranton and Rinaldi signed a lease by virtue of which the City of Scranton leased the Casey Parkway to Rinaldi's newly formed corporation, "Adams Parking Inc." (See petitioner's exhibit no. 7.) During the closing, certain lease provisions were renegotiated or deleted, and Hailstone and Attorney Rinaldi initialed each such modification to signify the approval of the changes by the parties to the lease. (*Id.*, pp. 2, 3, 4 and 10.) Once the deed had been duly recorded, Hailstone forwarded the original deed to the OECD executive director. (See petitioner's exhibit no. 12.)

The city recently entered into an agreement with a new developer, First Hospitality Group, to demolish the Hotel Casey and construct a new hotel featuring 225 suites, a 60,000 square foot conference center and rehabilitation of the Casey Parkway. (N.T., p. 68.) The city's agreement with FHG provides for the city to donate the Casey Parkway to FHG, and the preliminary plans depict a bridge connecting the Casey Parkway to the proposed convention center. (N.T., p. 68.) Thus, on October 5, 1998, the SRA commenced the above-captioned matter by the filing of a declaration of taking, seeking to acquire certain properties by eminent domain, including the Casey Parkway. (See condemnor's declaration of taking, exhibits "A," "C".) A copy of that declaration of taking was served on the City of Scranton as the owner of the property, as well as upon various tenants and subtenants, including Adams Parking Inc.

On October 14, 1998, Hailstone entered his appearance on behalf of Adams Parking Inc. in the above-captioned condemnation proceeding by the filing of prelimi-

nary objections to the declaration of taking. In its preliminary objections, Adams Parking Inc. contends that the declaration of taking is null and void ab initio since, inter alia:

"(h) Neither the property nor the Lackawanna East redevelopment area are blighted within the definition of blight as found in the Urban Redevelopment Law sections 1702 and 1712.1, 35 P.S. §§1702 and 1712.1.

"Pursuant to 35 P.S. §1702[,] the property is not blighted because: neither the property nor the area are unsafe, unsanitary, inadequate or overcrowded; neither the property nor the area are inadequately planned; neither the property nor the area are excessively covered by buildings; neither the property nor the area lack proper light, air and open space; neither the property nor the area are defectively designed or arranged; neither the property nor the area are being used for economically or socially undesirable purposes; and neither the property nor the area are faultily laid out. . . .

"(n) Because there is no blight of either the property or the area as defined by the URL, the SRA has no power or authority to condemn the property and its declaration is null and void ab initio.

"(o) Because there is no blight of the property or the area as defined by the URL, the SRA has acted in bad faith by finding the property and the area blighted.

"(p) The SRA has acted in an arbitrary and capricious manner by finding the property and the area blighted because there exists no blight as defined by the URL.

"(q) The SRA has abused its discretion by finding the property and the area blighted because there exists no blight as defined by the URL. . . .

"(s) The condemnation is excessive as to the property because the property would not need to be condemned to eliminate blight or to replan and redevelop the Lackawanna East redevelopment area . . . ." (See preliminary objections of Adams Parking Inc., pp. 3-5, ¶¶5(h), (i), (k), (n)-(q), (s).)

The Lackawanna East redevelopment area identified as the "area" in the preliminary objections includes "the 500 and portions of the 600 blocks of Lackawanna Avenue, portions of the northerly 100 block of Adams Avenue, areas between Dix and Lee courts and Center Street, and the southerly side of Bogart Place as the proposed redevelopment area, . . . [which] the Scranton Planning Commission, on September 4, 1997, certified . . . to be a blighted area." (See SRA resolution dated September 9, 1997, p. 2, and exhibit A attached thereto.) The project area map prepared by Marvin A. Brotter Consulting Services clearly portrays the Casey Parkway as located within the Lackawanna East redevelopment area. (See petitioner's exhibit no. 5.)

Upon receipt of the preliminary objections, counsel for the SRA forwarded a letter to Hailstone on October 16, 1998, objecting to Hailstone's representation of Adams Parking Inc. in this matter, and requesting that Hailstone and his firm disqualify themselves from acting as counsel in this litigation. (See petitioner's exhibit no. 16.) Counsel for the SRA advised Hailstone that she believed that he and his firm have a conflict of interest by virtue of the fact that (1) Adams Parking Inc.'s interests are adverse to the interests of the city and the SRA in this matter, and (2) Hailstone would have to be called "as a necessary witness" in light of the arguments raised by the preliminary objections. (*Id.*) The correspondence

further informed Hailstone that "[i]f you have not filed a withdrawal of appearance by Friday, October 23, 1998, I will file a petition to disqualify you and your firm as counsel. I would hope that you do not make this necessary." (*Id.*, p. 2.)

Since Hailstone declined to recuse himself or his firm, the SRA and the city filed the instant petition to disqualify on October 26, 1998.[2] The verification attached to the petition was executed by the current executive director of OECD, Parnell P. Joyce, Esquire, who attested "that he is director of the Office of Economic and Community Redevelopment, which is the administrative staff of the Redevelopment Authority of the City of Scranton, and that on behalf of said Redevelopment Authority of the City of Scranton, he is authorized to make this affidavit."

The gravamen of the petition is that Hailstone has a conflict of interest in representing Adams Parking Inc. in this proceeding due to his prior representation of OECD, the SRA and the interests of the city in the Rinaldi-city sale and lease. The city/SRA also note that the core properties for the current project were acquired through Hailstone's condemnation efforts from 1989 to 1992. The petition further maintains that the blight issues raised by Hailstone in the preliminary objections concern the same subject matter about which he advised the OECD and the SRA during the summer of 1989. In

2. Both the correspondence dated October 16, 1998 and the petition to disqualify erroneously cite Rule 1.7 of the Rules of Professional Conduct as a basis for the disqualification. Inasmuch as the putative conflict of interest is actually governed by Rule 1.9 regarding former clients, rather than Rule 1.7 pertaining to existing clients, the petition was amended without objection to incorporate Rule 1.9. (N.T., pp. 236-37.)

addition, the city/SRA submit that the SRA intends to call Hailstone as a witness in this condemnation litigation with regard to the blight finding and Rinaldi's rights, or lack thereof, under the lease dated September 11, 1989.

Hailstone counters that he merely provided legal services to OECD and did not knowingly represent the SRA in that he was unaware of the OECD project number notations that were recorded on his billings after they were submitted. Hailstone notes that in 1989, the "Hotel Casey project" had a different developer (Von Dohlen) and more narrow scope than the current plan with FHG, and, as a result, the two projects do not constitute "the same or a substantially related matter" under Rule 1.9. Specifically, the Von Dohlen proposal involved the rehabilitation of the existing Hotel Casey structure and did not include the Preno's and Pearle Vision Center properties. Moreover, Hailstone submits that he was simply a scrivener for the Rinaldi-city deed and lease, inasmuch as the substantive terms of those agreements were negotiated by the OECD executive director. (See Hailstone's answer and new matter to petition to disqualify, ¶¶22-27.)[3]

Two evidentiary hearings were conducted on November 25, 1998 and December 15, 1998, at which time testimony was received from Margaret Quinn, OECD finance manager; Jody Baden, OECD administrative as-

---

3. On November 6, 1998, Hailstone presented a motion to quash the petition to disqualify to the court en banc, although the motion itself was never filed with the clerk of judicial records. The court en banc declined to consider the motion to quash and deferred the matter to the judge to whom the petition to disqualify had been assigned. Since the motion to quash concerns the same issues addressed in the petition to disqualify, it will be considered and decided, notwithstanding the fact that it has not been filed of record.

sistant; Parnell Joyce, Esquire, OECD executive director; Donald King, certified planner for the City of Scranton; Andrew Hailstone, Esquire; and Anthony J. Rinaldi. At the conclusion of the proceedings on December 15, 1998, the parties agreed to submit their respective memoranda of law on December 21, 1998, (N.T., pp. 238-40), and the briefs were thereafter filed on that date.

With regard to the conflict of interest issue under Rule 1.9, Attorney Joyce testified that he "believe[d] there was an apparent conflict of interest [involving Hailstone] relative to his services for us as the city or the potential need for his services on behalf of the city and some ethical considerations as a practicing attorney." (N.T., p. 61, ll. 12-16.) During cross-examination, Mr. Joyce elaborated further and stated:

"Mr. Hailstone's previous engagement as a representative of the city's Office of Economic and Community Development entitled him to a full disclosure of all of the files relative to condemnations, actions, psychology, thinking patterns, funding sources and a plethora of information that could be used adversely to us in this instance, as these matters may mirror other condemnation matters that occurred during his term of employment." (*Id.,* p. 76, ll. 9-19.)

Joyce likewise noted that when the city/SRA were preparing for the Casey Parkway condemnation, they identified Hailstone as a potential witness in the event that Adams Parking Inc. filed preliminary objections. (N.T., pp. 58-59.)

Hailstone testified that he ceased representing OECD in June 1992, and was subsequently retained by the

Scranton Mall Associates L.P. to represent them in connection with litigation that had been commenced against the mall developers by opponents of that project. Since OECD had a common interest with the mall developers in successfully defending those lawsuits, OECD Executive Director Michael Washo forwarded a letter to HUD on December 11, 1992, requesting a conflict of interest exception on behalf of Hailstone under 24 C.F.R. §570.611(b). (See respondent's exhibit no. 1.) However, in contrast to the case sub judice, Hailstone's former client, OECD, expressly consented to Hailstone's representation of the mall developers in those proceedings and, in fact, actually solicited the HUD ruling. See Rule 1.9(a) (a lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client "unless the former client consents after a full disclosure of the circumstances and consultation"). By letter dated February 2, 1993, HUD's regional office advised the OECD executive director that "it would not be appropriate for the regional office to make a determination concerning [Hailstone's conflict of interest exception]" and it forwarded the "request to the office of general counsel in headquarters." (See respondent's exhibit no. 1.) Neither OECD nor Hailstone ever received a response from the office of general counsel and Hailstone proceeded to represent the mall developers in that litigation with the consent of OECD. (N.T., p. 169.)

In response to questioning posed by SRA counsel with regard to the SRA's assertion that Adams Parking Inc. does not have standing to challenge the condemnation, Hailstone testified:

"Q: You are familiar with the fact that it is necessary to name tenants for whatever rights they have pursuant to the existing law for relocation damages, correct?

"A: Not just for relocation damages, tenants under circumstances are allowed to share in any award for the value of the building if they have a bonus lease." (N.T., pp. 113-14.)

In that regard, it is important to note that the city-Adams Parking Inc. lease which was prepared by Hailstone expressly provides that "[t]he tenant shall *not* be entitled to claim or receive *any part of any* condemnation *award* payable to the landlord by reason of any such taking, but shall nevertheless be entitled to claim and receive any and all separate damages and reimbursements allowed to a tenant under existing laws." (Petitioner's exhibit no. 7, p. 5.) (emphasis added) Additionally, when cross-examined about the blight statements attributed to him in *The Scranton Times* and *Scrantonian Tribune* articles dated August 2, 1989, August 3, 1989 and August 4, 1989, Hailstone opined that the Hotel Casey is no longer dilapidated, unsanitary, a public nuisance or a fire hazard. (N.T., pp. 118-19.)

## II. DISCUSSION

### (A) *Conflict of Interest: Former Client*

Rule 1.9 of the Rules of Professional Conduct provides two independent bases for the recusal of a lawyer from any legal matter involving a former client, and states:

"A lawyer who has formerly represented a client in a matter shall not thereafter:

"(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after a full disclosure of the circumstances and consultation; or

"(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known."

The official comment accompanying Rule 1.9 analyzes the parameters of the foregoing prohibition and expressly provides "[t]hus, a lawyer could not properly seek to rescind on behalf of a new client a contract drafted on behalf of the former client." The comment further states that although a lawyer "is not precluded from later representing another client in a wholly distinct problem," it cautions that "[w]hen a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests clearly is prohibited."

Long before the adoption of the Rules of Professional Conduct and the Code of Professional Responsibility, "the common law recognized that a lawyer could not undertake a representation adverse to a former client in a matter 'substantially related' to that in which the lawyer previously had served the client." *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz,* 529 Pa. 241, 256, 602 A.2d 1277, 1284 (1992). As a consequence, courts have always been empowered to enjoin an attorney's potential violation of a fiduciary duty to a former client in light of the well-settled common-law "principle that an attorney's representation of a subsequent client whose interests are materially adverse to a former client in a

matter substantially related to matters in which he represented the former client constitutes an impermissible conflict of interest actionable at law." *Id.* at 252, 602 A.2d at 1282.

A former client seeking to disqualify a law firm from representing an adverse party bears the burden of proving: "(1) that a past attorney/client relationship existed which was adverse to a subsequent representation by the law firm of the other client; (2) that the subject matter of the relationship was substantially related; (3) that a member of the law firm, as attorney for the adverse party, acquired knowledge of confidential information from or concerning the former client, actually or by operation of law." *Estate of Pew,* 440 Pa. Super. 195, 244, 655 A.2d 521, 545-46 (1994).

Instantly, the evidence has clearly established that an attorney/client relationship existed between the SRA's administrative arm (the OECD) and Hailstone, and that Hailstone, perhaps unwittingly, provided legal advice to the SRA and represented the interests of the city. The OECD staff perceived Hailstone as representing the SRA as evidenced by the OECD's assignment of the "86-300" notation for his billings on SRA matters. Indeed, based upon Hailstone's attendance at SRA meetings and the advice that he provided to the SRA board with respect to the condemnation procedure to be followed in acquiring properties for the Hotel Casey project, the SRA minutes identified Hailstone as SRA counsel. Although Hailstone may not have considered himself to be acting as counsel for the SRA, it is the perspective of the SRA and OECD which controls the actual or implied existence of an attorney-client relationship. *Lavenson v. Loomis,* 7 D.&C.4th 188, 192 (Montg. Cty. 1990) ("[t]he existence

of the attorney-client relationship can also be found when it is not unreasonable for the client to have understood that he or she was represented by a particular attorney") (citing *E.F. Hutton & Co. v. Brown*, 305 F. Supp. 371 (S.D. Tex. 1969)). Even Hailstone's letter that he forwarded to Anthony J. Rinaldi on May 12, 1989 referred to the OECD executive director as "the chief active staff officer for the Scranton Redevelopment Authority." (Petitioner's exhibit no. 9.)[4]

During the course of his OECD contract, Hailstone also represented the interests of the city in declaring the project area blighted in order to facilitate the condemnation. In that regard, Hailstone advocated the city's position and protected its interests in proceeding before the VPRC to certify the area as blighted. More importantly, he represented the city's interests in connection with Rinaldi's sale of the Casey Parkway to the city "in lieu of condemnation" and the lease between the city and Rinaldi's wholly owned company, Adams Parking Inc. Thus, since it is undisputed that the respective positions of the city/SRA/OECD and Rinaldi/Adams Parking Inc. are adverse in the pending condemnation litigation, the city/SRA has satisfied the first element of the *Pew* standard.

---

4. Hailstone argues, and this court has previously noted, that municipal authorities such as the SRA are not creatures of the municipalities which organize them, but are independent agencies of the Commonwealth. See *Scranton Sewer Authority v. City of Scranton*, no. 98-EQ-60041, Nealon, J., p. 12 (Lacka. Cty. July 20, 1998) (quoting *Commonwealth v. Erie Metropolitan Transit Authority*, 444 Pa. 345, 348, 281 A.2d 882, 884 (1971)). While that legal characterization may be true, Hailstone's contention overlooks the fact that his acknowledged client, the OECD, acted as the administrative branch of the SRA and that Hailstone also performed legal services on SRA matters.

With regard to the second and third prongs of the *Pew* test, the Pennsylvania appellate courts have adopted the "substantial relationship" test articulated by the federal courts in *Realco Services Inc. v. Holt,* 479 F. Supp. 867 (E.D. Pa. 1979), and its progeny, *Triffin v. DiSalvo,* 434 Pa. Super. 326, 331, 643 A.2d 118, 120 (1994). In performing a substantial relationship analysis under Rule 1.9, the following questions must be addressed:

"(1) What is the nature and scope of the prior representation at issue?

"(2) What is the nature of the present lawsuit against the former client?

"(3) In the course of the prior representation, might the client have disclosed to his attorney confidences which could be relevant to the present action? In particular, could any such confidences be detrimental to the former client in the current litigation?" *Commonwealth Insurance Co. v. Graphix Hotline Inc.,* 808 F. Supp. 1200, 1204 (E.D. Pa. 1992); *Reading Anthracite Co. v. Lehigh Coal & Navigation Co.,* 771 F. Supp. 113, 115 (E.D. Pa. 1991).

The *Graphix Hotline* court provided further guidance for this inquiry and observed:

"In answering the first question, the court should focus upon the reasons for the retention of counsel and the tasks which the attorney was employed to perform. With respect to the second question, the court should evaluate the issues raised in the present litigation and the underlying facts. Finally, in answering the third question, the court should be guided by the interpretation of the word 'might' set forth in *Realco. [INA Underwriters Ins. Co. v.] Nalibotsky,* 594 F. Supp. [1199] at 1206 [E.D. Pa. 1984]." *Graphix Hotline Inc., supra.*

Two matters are "substantially related" under Rule 1.9(a) "when an attorney might have acquired confidential information as counsel in one matter which is also relevant to the other matter." *ILA Local Union 1332 v. ILA*, 909 F. Supp. 287, 291 (E.D. Pa. 1995) (citing *Akerly v. Red Barn System Inc.*, 551 F.2d 539, 544 n.12 (3d Cir. 1977)). In that regard, "the case law reveals that disqualification is proper when the similarity in the two representations is enough to raise a common-sense inference that what the lawyer *learned* from his former client will prove useful in his representation of another client whose interests are adverse to those of the former client." *Cardona v. General Motors Corp.*, 942 F. Supp. 968, 973 (D.N.J. 1996) (emphasis in original) (quoting ABA/BNA *Lawyers Manual on Professional Conduct* at 51:215 (1996)). Most importantly, "once a substantial relationship between present and past representations has been established, an 'irrebuttable presumption' arises that confidential information relevant to the present dispute might have been obtained through the prior representation." *Dworkin v. General Motors Corp.*, 906 F. Supp. 273, 279 n.7 (E.D. Pa. 1995); *Reading Anthracite Co.*, 771 F. Supp. at 117.

With regard to the nature of Hailstone's prior representation and the tasks that he performed, the record firmly establishes that Hailstone authored virtually all of the relevant documentation concerning the Hotel Casey project.[5] Hailstone also conducted legal research

---

5. While it is true that the Von Dohlen proposal involved fewer properties and called for the renovation, rather than the demolition, of the Hotel Casey, the current FHG project is merely an extension of the original matter that Hailstone handled. For purposes of the conflict of interest issue under consideration, any dissimilarity between the two projects constitutes a distinction without a difference.

of the blighted property statute, 35 P.S. §1712.1, advised the SRA board as to the proper procedure to be followed in condemning the Hotel Casey project properties, prepared the VPRC ordinance, and attended meetings of the VPRC and the CPC concerning the blight designation. Hailstone was directly involved with the Rinaldi-city transaction and personally delivered the SRA's threat to condemn the Casey Parkway. In addition to preparing the Rinaldi-city deed and lease, Hailstone's billings reflect that he negotiated certain revisions to the Rinaldi-city closing documents (see petitioner's exhibit no. 2, p. 31), and formally approved those modifications on behalf of the city by initialing them.

The issues raised by Adams Parking Inc. in the present litigation are directly related to Hailstone's former representation of the OECD/SRA/city. Adams Parking Inc. contends that the Lackawanna East redevelopment area is not blighted even though most of the property located in that area was designated as blighted in 1989 by the VPRC and the CPC based, in part, upon the advice of Hailstone. Furthermore, although Hailstone previously characterized the Casey Hotel as "dilapidated, unsafe, unsanitary . . . a public nuisance and a fire hazard" in his remarks to the local media, he is now of the opinion that it is no longer dilapidated, unsanitary, a public nuisance or a fire hazard. (N.T., pp. 118-19.) Additionally, the standing and rights of Adams Parking Inc. are at issue in this condemnation proceeding, and although the lease which was prepared by Hailstone states that the tenant is not entitled to claim any portion of the condemnation award, (petitioner's exhibit no. 7, p. 5), Hailstone testified that a tenant's remedies are not limited to relocation damages since a tenant may be "allowed to share in any

award for the value of the building if they have a bonus lease." (N.T., pp. 113-14.) But see Rule 1.9 comment ("[t]hus, a lawyer could not properly seek to rescind on behalf of a new client a contract drafted on behalf of the former client").

Hence, it is patently clear that a substantial relationship exists between Hailstone's former representation of the OECD/SRA/city and his current service on behalf of Rinaldi/Adams Parking Inc. In light of the fact that a substantial relationship has been established, there is an irrebuttable presumption that confidential information germane to the present dispute might have been secured by Hailstone during the prior representation. *Dworkin, supra; Reading Anthracite Co., supra.* The potential for such a deliberate or inadvertent appropriation of confidential information is underscored by the concerns expressed by the current OECD executive director regarding OECD's past disclosure to Hailstone "of all of the files relative to condemnations, actions, psychology, thinking patterns, funding sources and a plethora of information that could be used adversely to us in this instance." (N.T., p. 76.)

Consequently, in light of the glaring similarity between Hailstone's former representation of the OECD/SRA/city and his present involvement as counsel for Rinaldi/ Adams Parking Inc., the mandate of Rule 1.9 compels the disqualification of Hailstone from acting as counsel for Rinaldi and Adams Parking Inc. in the condemnation proceedings.[6] To hold otherwise would contravene

---

6. Hailstone contends that he was simply a "scrivener" of the closing documents and did not negotiate the material terms of the documents that he prepared. Only one jurisdiction has ever recognized a "scrivener's exception" to the substantial relation test, and even that court held that the exception must "be construed extremely narrowly"

the directive of the Supreme Court of Pennsylvania in *Maritrans* that:

"There are few of the business relations of life involving a higher trust and confidence than those of attorney and client or, generally speaking, one more honorably and faithfully discharged; few more anxiously guarded by the law, or governed by sterner principles of morality and justice; and it is the duty of the court to administer them in a corresponding spirit, and to be watchful and industrious, to see that confidence thus reposed shall not be used to the detriment or prejudice of the rights of the party bestowing it." *Maritrans,* 529 Pa. at 253-54, 602 A.2d at 1283 (quoting *Stockton v. Ford,* 52 U.S. (11 How.) 232, 247, 13 L.Ed. 676 (1850)).

### (B) *Disqualification Due to Former Status As Special Counsel to a Governmental Agency*

Although Rule 1.9 of the Rules of Professional Conduct requires Hailstone's recusal, his disqualification is also appropriate under Rule 1.11(a) which provides that "a lawyer shall not represent a private client in connection with a matter in which the lawyer participated personally and substantially as a public . . . employee, unless the appropriate government agency consents after consultation." The official comment to Rule 1.11 notes that "unfair advantage could accrue to the private client by reason of access to confidential government informa-

---

and "if the attorney furnishes any legal advice to a client, or in any way makes use of her or his legal skills, the exception will not apply." *Griffith v. Taylor,* 937 P.2d 297, 305 (Alaska 1997). Assuming arguendo that such an exception was cognizable in Pennsylvania, it would not apply to the case sub judice in light of the fact that Hailstone also provided legal advice and made ample use of his legal skills.

tion about the client's adversary obtainable only through the lawyer's government service." Moreover, the comment states:

"A lawyer representing a government agency, whether employed or *specially retained by the government,* is subject to the Rules of Professional Conduct, including the prohibition against representing adverse interests stated in Rule 1.7 and the protections afforded former clients in Rule 1.9. In addition, such a lawyer is subject to Rule 1.11 and to statutes and government regulations regarding conflict of interest. Such statutes and regulations may circumscribe the extent to which the government agency may give consent under this rule." (emphasis added)

For example, by virtue of his special counsel status, Hailstone was restricted in his ability to represent the mall developers due to the regulatory constraints set forth in 24 C.F.R. §570.611(b). (See respondent's exhibit no. 1.) Although the OECD requested a waiver of that limitation based upon its common interest with the mall developers, it has specifically objected to Hailstone's representation of Rinaldi/Adams Parking Inc. for the compelling and cogent reasons stated by the present OECD executive director during his testimony. (N.T., p. 76.)

Even prior to the adoption of Rule 1.11, the Supreme Court of Pennsylvania imposed significant limitations upon the legal representation which could be undertaken by former government attorneys and employees. See *e.g., City of Philadelphia v. District Council 33, AFL-CIO,* 503 Pa. 498, 504, 469 A.2d 1051, 1054 (1983) (law firm of former city managing director disqualified from representing union in litigation involving a collective bargaining agreement with which the director had involve-

ment); *Commonwealth of Pennsylvania v. Eastern Dawn Mobile Home Park,* 486 Pa. 326, 330, 405 A.2d 1232, 1234 (1979) (firm of former county deputy district attorney barred from defending trailer park in litigation involving anti-competitive conduct that attorney helped investigate during his government service). As long as the former government employee or counsel had substantial prior involvement with the matters at issue in the subsequent litigation, it is irrelevant whether the ex-client may or may not be harmed by the representation. *District Council 33, AFL-CIO,* 503 Pa. at 504, 469 A.2d at 1054 ("[w]hether or not Levinson will be able to use the knowledge which he acquired during the negotiations to the union's advantage is immaterial because this court has never required a showing of potential or actual damage for disqualification"). See also, *Rennie v. Hess Oil Virgin Islands Corp.,* 981 F. Supp. 374, 378 (D.V.I. 1997) (citing *District Council 33* and holding that "in order to avoid further public skepticism of the integrity of the government, and to safeguard against the potential harm to the adversary process, [former Department of Labor employee] must be disqualified from participating in the within cases").

Based upon the "substantial relationship" analysis employed above with respect to Rule 1.9, Hailstone is likewise disqualified from representing Rinaldi or Adams Parking Inc. in this matter pursuant to Rule 1.11(a) in light of his status as special counsel to OECD. See *Wright v. Williams,* 29 D.&C.4th 46, 54 (Berks Cty. 1995) (recusing a former special counsel to domestic relations from representing a private client in a substantially related matter). Furthermore, as discussed in greater detail in section II(D) below, Hailstone's law firm is likewise

barred from participation in this proceeding as a result of Hailstone's disqualification. *Caracciolo v. Ballard,* 687 F. Supp. 159, 160 (E.D. Pa. 1988).

## (C) *Lawyer As Witness*

The city/SRA also seeks Hailstone's disqualification on the grounds that he is likely to be a necessary witness in this litigation. Rule 3.7 of the Rules of Professional Conduct states:

"(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:

"(1) the testimony relates to an uncontested issue;

"(2) the testimony relates to the nature and value of legal services rendered in the case; or

"(3) disqualification of the lawyer would work substantial hardship on the client."

No testimony or evidence has been offered in support of any claim that Hailstone's recusal would cause a substantial hardship to Rinaldi or Adams Parking Inc., nor does his proffered testimony merely concern the value of his legal services. Rather, the focus instantly is whether Hailstone is likely to be a necessary witness regarding a contested issue.

The preliminary objections filed by Adams Parking Inc. and the testimony of Hailstone at the time of the hearings on November 25, 1998 and December 15, 1998, have clearly injected the validity of the blight finding and the lease provisions into this case, thereby making those issues hotly contested matters. Notwithstanding that fact, Hailstone may be "a necessary witness" only if no other witness could testify on that subject and the lawyer's proposed testimony would merely be cumulative. *United*

*Food & Commercial Workers v. Darwin Lynch,* 781 F. Supp. 1067, 1069-70 (M.D. Pa. 1991); *Kehrer v. Nationwide Insurance Co.,* 21 D.&C.4th 385, 389 (Lanc. Cty. 1994) (citing ABA/BNA *Law Manual on Professional Conduct* 61:507 (1984)).

Since Hailstone was the author of the city-Adams Parking Inc. lease, he would be a necessary witness with respect to the interpretation and effect of the lease provisions governing condemnation. Similarly, only Hailstone could testify regarding his blight remarks to the local media, his research of 35 P.S. §1712.1, his advice to the SRA board, his preparation of the VPRC ordinance, and his negotiations with Rinaldi. Nevertheless, it would be premature to disqualify Hailstone under Rule 3.7 at this early stage of the proceedings without affording the parties an opportunity to conduct some preliminary discovery concerning the contested issues which would be the subject of his testimony. Depending upon the result of that pretrial preparation, Hailstone's recusal may become warranted at that time. See *Caplan v. Braverman,* 876 F. Supp. 710, 712 (E.D. Pa. 1995) ("[w]aiting until discovery is completed on this issue is the best course to resolve this potential conflict. . . . If it becomes likely that [counsel] will be a witness on this contested issue, Rule 3.7 will certainly preclude his participation as her trial advocate").

Thus, Rule 3.7(a) does not serve as a basis for Hailstone's disqualification at the present time. However, for the reasons stated above, Rule 1.9 and Rule 1.11 both serve as independent grounds for Hailstone's immediate recusal.

## (D) *Imputed Disqualification*

Rule 1.10(a) of the Rules of Professional Conduct governs the imputed disqualification of an entire law firm based upon the recusal of one of its members and states that "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules . . . 1.9." See *Reading Anthracite Co., supra* (member of a disqualified law office must also recuse herself even though her employment at the time of the disputed transactions was limited to a summer internship). Under this rule, confidential information which may have been "gained by one member of a law firm is imputable to other members of the same law firm." *Estate of Pew,* 440 Pa. Super. at 244, 655 A.2d at 545.

Inasmuch as Hailstone is disqualified from acting as counsel for Rinaldi or Adams Parking Inc. in this matter, Rule 1.10(a) likewise prohibits the firm of Kreder, Brooks, Hailstone & Ludwig from representing those same parties in this litigation. Accordingly, an order will be entered disqualifying Hailstone and the law firm of Kreder, Brooks, Hailstone & Ludwig from any further involvement with this proceeding.

## ORDER

And now, December 23, 1998, upon consideration of the "petition to disqualify Andrew Hailstone and Kreder, Brooks, Hailstone & Ludwig of condemnor, SRA, and condemnee, City of Scranton," the "motion to quash the petition to disqualify Andrew Hailstone and Kreder, Brooks, Hailstone & Ludwig of the condemnor, SRA, and condemnee, City of Scranton," the testimony and exhibits submitted by the parties, the memoranda of law

102

and the argument of counsel, and based upon the reasoning set forth in the foregoing memorandum, it is hereby ordered and decreed that:

(1) The petition to disqualify Andrew Hailstone and the law firm of Kreder, Brooks, Hailstone & Ludwig from acting as counsel for Adams Parking Inc. is granted;

(2) The motion to quash the petition to disqualify Andrew Hailstone and Kreder, Brooks, Hailstone & Ludwig is denied; and

(3) Andrew Hailstone, Esquire, and the law firm of Kreder, Brooks, Hailstone & Ludwig are barred from any further participation in the above-captioned litigation as counsel for Adams Parking Inc.